Jesse S. Johnson (to seek admission *pro hac vice*)
Florida Bar No. 0069154
GREENWALD DAVIDSON RADBIL PLLC
7601 N. Federal Hwy., Suite A-230
Boca Raton, FL 33487
Telephone: 561-826-5477
jjohnson@gdrlawfirm.com

*Counsel for Plaintiff and the proposed class*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria T. Archuleta, on behalf of herself and others similarly situated, | ) Case No. |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **CLASS ACTION COMPLAINT AND** |
| | ) **TRIAL BY JURY DEMAND** |
| 1A Smart Start, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**Nature of the Action**

1.     Maria T. Archuleta ("Plaintiff") brings this class action against 1A Smart Start, LLC ("Defendant") under the Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667, and its implementing regulations, 12 C.F.R. § 1013 *et seq.* ("Regulation M"), on behalf of herself and other similarly situated consumers.

2.     She alleges that Defendant violated the CLA and Regulation M by failing to provide important financial disclosures in its ignition interlock lease agreements with consumers—either by omission or obfuscation.

3.     In other words, as a result of Defendant's conduct, Plaintiff and other lessees signed equipment lease agreements with Defendant without understanding their true financial obligations, which is precisely what the CLA aims to avoid.

4.     "Congress enacted the CLA as an amendment to the [Truth in Lending Act ("TILA")] and [thereby] extended the TILA's 'credit disclosure requirements to consumer leases.'" *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 209 (D. Conn. 2001).[1]

5.     TILA—and, by extension, the CLA—thus was put in place to protect consumers from obfuscation or misinformation in credit and lease transactions.

6.     Congress recognized and sought to remedy the information imbalance in such transactions, particularly for inexperienced or uninformed consumers lacking the

---

[1]     Internal citations and quotations are omitted, and emphasis is added, unless otherwise noted.

financial shrewdness of those companies responsible for extending them credit or leasing them products—like Defendant here.

7.      Defendant's lease agreements with Plaintiff and all putative class members are defective for the same reasons: they do not provide several financial disclosures required by the CLA and Regulation M in a manner that satisfies the statute and its regulations.

**Jurisdiction and Venue**

8.      This Court has subject matter jurisdiction under 15 U.S.C. § 1667d(c) and 28 U.S.C. § 1331.

9.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), as the events giving rise to Plaintiff's action occurred in this district, and as Defendant transacts business in this district.

**Parties**

10.      Plaintiff is a natural person who, at all relevant times, resided in Pinal County, Arizona.

11.      Plaintiff is a "lessee" as defined under the CLA, 15 U.S.C. § 1667(2).

12.      Defendant is a limited liability company formed in the state of Delaware and registered in Maricopa County, Arizona.[2]

13.      Defendant maintains principal offices in Grapevine, Texas.

---

[2]      Defendant began operations under the "Smart Start, Inc." name but transitioned to "1A Smart Start, LLC" after a corporate acquisition. *See* https://www.smartstartinc.com/media-center/our-history/ (last visited May 19, 2020).

14.    Defendant offers, in its view, the "[b]est interlock on the planet, period."[3]

15.    The ignition interlock device that Defendant leases to consumers "is a piece of electronic equipment that tests your level of alcohol consumption and prevents you from driving your car, truck, SUV, or crossover vehicle until you can pass a test.  It is installed in your vehicle's electrical system and interrupts the starter in the event of a failed test.  In cases of a DUI or a DWI charge, an Ignition Interlock Device and restricted driver's license can often take the place of a suspended license."[4]

16.    Defendant offers its ignition interlock devices at over 1,800 installation locations nationwide.[5]

17.    Defendant leases its ignition interlock devices to drivers throughout the country through use of "consumer leases" as defined under the CLA, 15 U.S.C. § 1667(1).

18.    Thus, Defendant is a "lessor" as defined by 15 U.S.C. § 1667(3).

### Background of the CLA

19.    The CLA at its core requires disclosure of important terms—particularly financial terms—to protect consumers entering into lease agreements.

20.    "Passed by Congress as an amendment to the Truth In Lending Act [], the CLA purports 'to assure a meaningful disclosure' of personal property lease terms to

---

[3]    https://www.smartstartinc.com/ (last visited May 19, 2020).

[4]    https://www.smartstartinc.com/general-faq/#toggle-id-1 (last visited May 19, 2020).

[5]    https://www.smartstartinc.com/ (last visited May 19, 2020).

3

'enable the lessee to compare more readily the various lease terms available to him [and] limit balloon payments in consumer leasing.'" *Gaydos v. Huntington Nat. Bank*, 941 F. Supp. 669, 672 (N.D. Ohio 1996) (quoting 15 U.S.C. § 1601(b)).

21.     In other words,

> [b]ecause lease financing had become recognized as an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to enable comparison of lease terms with credit terms where appropriate. The CLA thus requires lessors of personal property subject to its provisions to make specified disclosures when a lease is entered into.

*Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 454 (2d Cir. 1999).

22.     Accordingly, TILA's "strict liability standard attaches to violations of CLA disclosure requirements as well." *Gaydos*, 941 F. Supp. at 672.

23.     Also important, "TILA reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Layell v. Home Loan & Inv. Bank, F.S.B.*, 244 B.R. 345, 350 (E.D. Va. 1999).

24.     And given the CLA's enactment within the same statutory structure, this philosophy applies with equal force to the CLA and Regulation M.

**Statutory Disclosure Requirements**

25.     To that end, the CLA and Regulation M require several types of disclosures in a consumer lease, all of which must be made in a clear and conspicuous manner.

26.     Significantly, certain of the disclosures described in Regulation M also must be made in a "segregated" manner, separate and apart from the other lease terms:

> The following disclosures shall be segregated from other information and shall contain only directly related information: §§ 1013.4(b) through (f),

4

(g)(2), (h)(3), (i)(1), (j), and (m)(1). The headings, content, and format for the disclosures referred to in this paragraph (a)(2) shall be provided in a manner substantially similar to the applicable model form in appendix A of this part.

12 C.F.R. pt. 1013.3(a)(2).

27.     Those disclosures that must be "segregated from other information" include:

- The amount due at lease signing or delivery;

- The number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments;

- The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments;

- The total of payments, with a description such as "the amount you will have paid by the end of the lease";

- A statement regarding whether the lessee has the option to purchase the leased property, and, if at the end of the lease term, the purchase price; and

- A statement that the lessee should refer to the remainder of the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable.

12 C.F.R. pt. 1013.4.

28.     And per 12 C.F.R. pts. 1013.3 and 1013.4, these segregated disclosures must "be provided in a manner substantially similar to the applicable model form in appendix A" of Regulation M.

29.     In other words, if a lessor chooses *not* to use the model form attached to the implementing regulations (and attached here as Exhibit A), the requisite "segregated"

disclosures must be given in a manner at least "substantially similar to" to that model form.

30.    These requirements for "segregated" disclosures date back to 1996, when the Board of Governors of the Federal Reserve System ("Board") conducted a review of Regulation M to ensure its continued and adequate protection of consumers.[6]

31.    Among the Board's observations in 1996: "The major revision to this section [of Regulation M] . . . is the requirement to segregate certain disclosures from other information. Clear and conspicuous lease disclosures must be given prior to consummation of a lease on a dated written statement that identifies the lessor and lessee." 61 FR 52246-01, 52249 (Oct. 7, 1996).

32.    The Board amended paragraph 3(a)(1) of Regulation M [12 C.F.R. pt. 1013.3(a)(1)] as follows:

> Former §§ 213.4(a)(1) and 4(a)(2) required that all disclosures be made together on a separate statement or in the lease contract "above the place for the lessee's signature." The Board has deleted this requirement along with the meaningful sequence, same-page, and type-size disclosure requirements, replacing them with the requirement that disclosures be segregated. Most commenters generally supported the proposed segregation requirement, although some commenters opposed the deletion of the other requirements. They believed that the signature requirement ensured that lessors would give disclosures before the consumer becomes obligated on the lease and discouraged lessors from putting important information on the back of a lease document. The Board believes that a segregation requirement and the clear and conspicuous standard provide the same level of protection as the previous rules.

---

[6]    The Board remained tasked with oversight of the CLA and Regulation M until the creation of the Consumer Financial Protection Bureau ("CFPB") in 2011, at which time the CFPB assumed the Board's role with respect to such oversight.

> The segregated disclosures and other CLA disclosures must be given to a consumer at the same time. Lessors must continue to ensure that the disclosures are given to lessees before the lessee becomes obligated on the lease transaction. For example, by placing disclosures that are included in the lease documents above the lessee's signature, or by including instructions alerting a lessee to read the disclosures prior to signing the lease.
>
> Nonsegregated disclosures need not all be on the same page, but should be presented in a way that does not obscure the relationship of the terms to each other.

*Id.*

33.    To that end, the Board also amended paragraph 3(a)(2) [12 C.F.R. pt. 1013.3(a)(2)] as follows:

> Most commenters—representing both the industry and consumer groups—generally supported some form of segregation of leasing disclosures. **Many commenters believed that consumers would be more likely to read and understand the disclosures if key items were segregated from other disclosures and contract terms.** Pursuant to its authority under section 105(a) of the TILA, **the Board has adopted the requirement that certain consumer leasing disclosures be segregated from other required disclosures and from general contract terms to assure clear, conspicuous, and meaningful disclosure of lease terms.**
>
> Some commenters, including trade groups that represent a large portion of the motor vehicle leasing industry, suggested that the more important disclosures be further highlighted in a manner similar to the Board's Regulation Z. **The Board believes that the segregation requirement and the requirement that disclosures be in a form substantially similar to the applicable model form in appendix A adequately focuses the consumer's attention on key information.**
>
> Lessors may provide the segregated disclosures on a separate document or may include them in their lease contracts, apart from other information. The general content, format, and headings for these disclosures should be substantially similar to those contained in the model forms in appendix A. Lessors may continue to provide the remaining disclosures required by Regulation M and the CLA in a nonsegregated format.

> The model forms in Appendix A for open-end leases, closed-end leases, and furniture leases have been revised.

*Id.*

## Factual Allegations

34.    In October 2018, Defendant installed one of its ignition interlock devices in Plaintiff's vehicle.

35.    On or about October 16, 2018, Plaintiff signed a "Contract for the Provision of Monitoring Services" with Defendant, which is a lease agreement whereby Plaintiff agreed to pay Defendant monthly for use of an ignition interlock device that would be returned when no longer needed.

36.    A copy of the parties' lease agreement is attached as Exhibit B (the "Agreement").

37.    Plaintiff leased the ignition interlock equipment for personal, family or household purposes—namely, for personal use in a vehicle.

38.    The initial lease term began in October 2018 and continued through at least July 2019, when she lost possession of her vehicle and therefore no longer needed, or used, the ignition interlock equipment.

39.    The first page of the Agreement is dominated by several sections describing "CLIENT INFORMATION," "COURT INFORMATION," "THEFT WARRANTY," "RECOVERY COST," "TRAINING ACKNOWLEDGEMENT," as well as a separate section to be completed by a "Smart Start Representative." Ex. B at 1.

40.    Each of these individual sections is outlined in a thin, black border.

41. Thus, visually, the Agreement is comprised of several different rectangular boxes.

42. Significantly, however, the payment disclosures offered by Defendant are found in single-spaced text sandwiched between two of these rectangular boxes roughly three-quarters of the way down the page.

43. There, Defendant states:

> CONTRACT Payments (figures do not include any applicable tax) The CONTRACT payment for services is $ 69/76  per month, or any portion thereof. Enrollment fee, $  0  , Lockout fee, $  75/50  , Termination fee, $ 250  , Transfer fee $  150  , $100 by-pass charge. The first month's CONTRACT payment for services and the enrollment fee are payable in advance. Thereafter, the monthly CONTRACT shall be payable on the corresponding day of each month, until the service is terminated and all equipment is returned to Smart Start.

*Id.* (emphasis in original).

44. Notably, all figures save for the $100 by-pass charge were written into the Agreement by hand in designated spaces left blank so that Defendant's representatives could insert the figures at the time of signing.

45. Additionally, Defendant's representatives appear to have written into the Agreement's margins more payment figures not included in the pre-printed text of the Agreement.

46. Among these added figures are a $75 "REMOVAL" fee and $10 "MODEM FEE." *Id.*

47. Flipping the page reveals several more contractual provisions appearing in small, single-spaced print. *See id.* at 2.

9

48.     Of relevance here, under "CLIENT'S OBLIGATIONS," the Agreement reads:

> During the term of this Contract, Client agrees to (1) follow instructions and procedures to ensure effective provision of the monitoring service; (2) pay a service enrollment fee, a termination fee, including lock out fees as stated under CONTRACT Payments; (3) prepay the service enrollment fee and make payments every thirty (30) days thereafter (or as otherwise agreed) of the CONTRACT amount; (4) pay to SMART START all taxes applicable to payments required under this *CONTRACT*; (5) reimburse SMART START for any loss or damage to service equipment which occurs while the monitoring service is being provided to client; (6) ensure proper continuity of the monitoring service by delivering service equipment to SMART START during SMART START's normal business hours for recalibration and, upon termination of this service agreement, delivering service equipment for removal; (7) make all service payments to SMART START or a Smart Start approved direct payment vendor by a method approved by SMART START; and (8) pay a collection fee of 35% of outstanding delinquent balances should SMART START have to turn this account over to an agency or attorney and pay all reasonable and necessary attorneys' fees and court costs.

*Id.* (emphasis in original).

49.     During her lease term, Plaintiff paid Defendant several hundred dollars in total for use of the ignition interlock equipment subject to the lease Agreement.

50.     Plaintiff typically paid Defendant monthly, sometimes paying as little as $79 and sometimes as much as $129, depending on what fees and charges Defendant applied to her account during each visit.

51.     The most common fees Defendant applied, and Plaintiff paid, were a $69 "System Service" fee as well as a $10 "State Required Modem Fee."

### Class Allegations

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of a class defined as:

All persons (1) with an address in Arizona (1) to whom 1A Smart Start, LLC leased an ignition interlock device for personal, family, or household purposes, (2) with an initial lease term greater than four months, (3) for which the lease is currently in force or was terminated on or after May 19, 2019, and (4) and in connection with which 1A Smart Start, LLC failed to provide, prior to the consummation of the lease, segregated written disclosures informing the lessee of (a) the amount due at lease signing or delivery; (b) the payment schedule and total amount of periodic payments; (c) the total amount of other charges payable to 1A Smart Start, LLC, itemized by type and amount, which are not included in the periodic payments; (d) the total of payments owed under the lease; (e) a statement of whether or not the lessee has the option to purchase the leased property, and, if at the end of the lease term, the applicable purchase price; or (f) a statement referencing other requisite, non-segregated disclosures.

53.    Excluded from the class is Defendant, its officers and directors, and any entity in which Defendant has or had a controlling interest.

54.    The proposed class satisfies Rule 23(a)(1) because, upon information and belief, it is so numerous that joinder of all members is impracticable.

55.    The exact number of class members is unknown to Plaintiff at this time and can only be determined through appropriate discovery.

56.    The proposed class is ascertainable because it is defined by reference to objective criteria.

57.    In addition, the proposed class is identifiable in that, upon information and belief, the names and addresses of all members of the proposed class can be identified in business records maintained by Defendant.

58.    The proposed class satisfies Rules 23(a)(2) and (3) because Plaintiff's claims are typical of the claims of the members of the class.

59.     To be sure, Plaintiff's claims and those of the members of the class originate from the same standardized lease agreement utilized by Defendant, and Plaintiff possesses the same interests and has suffered the same injuries as each member of the proposed class.

60.     Plaintiff satisfies Rule 23(a)(4) because she will fairly and adequately protect the interests of the members of the class and has retained counsel experienced and competent in class action litigation.

61.     Plaintiff has no interests that are contrary to or irrevocably in conflict with the members of the class that she seeks to represent.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since, upon information and belief, joinder of all members is impracticable.

63.     Furthermore, as the damages suffered by individual members of the class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the class to individually redress the wrongs done to them.

64.     There will be no extraordinary difficulty in the management of this action as a class action.

65.     Issues of law and fact common to the members of the class predominate over any questions that may affect only individual members, in that Defendant has acted on grounds generally applicable to the class.

66.     Among the issues of law and fact common to the class:

a. Defendant's violations of the CLA as alleged herein;

b. Defendant's use of form Contracts for the Provision of Monitoring Services;

c. Defendant's practice of providing Contracts for the Provision of Monitoring Services without segregated disclosures as required by the CLA;

d. the availability of statutory penalties; and

e. the availability of attorneys' fees and costs.

**Count I: Violations of 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4**

67.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 66.

68.     At 15 U.S.C. § 1667a, the CLA requires in pertinent part that "[e]ach lessor shall give a lessee prior to the consummation of the lease a dated written statement on which the lessor and lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:"

(1)     A brief description or identification of the leased property;

(2)     The amount of any payment by the lessee required at the inception of the lease;

(3)     The amount paid or payable by the lessee for official fees, registration, certificate of title, or license fees or taxes;

(4)     The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market

value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability;

\* \* \*

(9)     The number, amount, and due dates or periods of payments under the lease and the total amount of such periodic payments

69.     Regulation M further demands that certain disclosures be made in a "segregated" manner separate and apart from all other information contained in a consumer lease:

> The following disclosures shall be segregated from other information and shall contain only directly related information: §§ 1013.4(b) through (f), (g)(2), (h)(3), (i)(1), (j), and (m)(1). The headings, content, and format for the disclosures referred to in this paragraph (a)(2) shall be provided in a manner substantially similar to the applicable model form in appendix A of this part.

12 C.F.R. pt. 1013.3(a)(2).

70.     Among those disclosures required to be "segregated" in such a manner:

> **(b) Amount due at lease signing or delivery.** The total amount to be paid prior to or at consummation or by delivery, if delivery occurs after consummation, using the term "amount due at lease signing or delivery." The lessor shall itemize each component by type and amount, including any refundable security deposit, advance monthly or other periodic payment, and capitalized cost reduction; and in motor vehicle leases, shall itemize how the amount due will be paid, by type and amount, including any net trade-in allowance, rebates, noncash credits, and cash payments in a format substantially similar to the model forms in appendix A of this part.

> **(c) Payment schedule and total amount of periodic payments.** The number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments.

> **(d) Other charges.** The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments. Such charges include the amount of any liability the lease imposes upon the lessee at the end of the lease term; the potential difference

14

between the residual and realized values referred to in paragraph (k) of this section is excluded.

**(e) Total of payments.** The total of payments, with a description such as "the amount you will have paid by the end of the lease." This amount is the sum of the amount due at lease signing (less any refundable amounts), the total amount of periodic payments (less any portion of the periodic payment paid at lease signing), and other charges under paragraphs (b), (c), and (d) of this section. In an open-end lease, a description such as "you will owe an additional amount if the actual value of the vehicle is less than the residual value" shall accompany the disclosure.

* * *

**(i) Purchase option.** A statement of whether or not the lessee has the option to purchase the leased property, and:

> **(1) End of lease term.** If at the end of the lease term, the purchase price; and

* * *

**(j) Statement referencing nonsegregated disclosures.** A statement that the lessee should refer to the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable.

* * *

12 C.F.R. pt. 1013.4.

71.     Here, Defendant violated 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4 in several respects by failing to provide such segregated disclosures, as described above, in the form and manner required by the CLA and Regulation M, prior to the consummation of Plaintiff's lease Agreement.

72.     Specifically, regarding section 1667a(2), the Agreement does not properly explain what amount(s) Plaintiff is required to pay at the inception of the lease. *See generally* Ex. B.

15

73.     As to section 1667a(3), while the Agreement references payment of taxes, it does not explain precisely what amount(s) of taxes are owed as part of Plaintiff's payments.

74.     As to section 1667a(4), the Agreement does not adequately explain what "other charges" are payable aside from the monthly payments—which is particularly confusing since the Agreement *does* list several other types of potential charges, including a "Lockout fee," "Termination fee," "Transfer fee," "by-pass charge," "MODEM FEE," and "Removal" fee. *See* Ex. B at 1.

75.     As to section 1667a(9), the Agreement similarly fails to disclose the number, amount, and due dates of Plaintiff's required monthly payments under the lease, as well as the total amount of such monthly payments owed. *See* Ex. B at 1.

76.     At best, the Agreement requires a "payment for services" of "$69/76 per month, or any portion thereof," *id.*, without explaining *when* this payment is due, how many such payments are owed, or what the total of these payments will be.

77.     Turning to Regulation M's requirements for certain "segregated" disclosures, nowhere in the Agreement does Defendant specifically list an "amount due at lease signing or delivery," nor does it otherwise explain precisely what amount of money is due at the lease signing—let alone in a "segregated" manner—in contravention of 12 C.F.R. pt. 1013.4(b). *See generally* Ex. B.

78.     Concerning 12 C.F.R. pt. 1013.4(c), Plaintiff's Agreement fails to explain the number, amount, and due dates or periods of payments, nor does it explain the total of periodic payments owed under the Agreement.

16

79.    To be sure, while the Agreement lists a monthly "payment for services" of "$69/76" (which does "not include any applicable tax"), it does not then specify: (i) what amount of tax will be charged in addition to the "$69/76" base payment; (ii) the number of monthly payments required; (iii) the due dates for the monthly payments; (iv) whether any of the various other fees listed also will be charged monthly; or (v) the total of the monthly payments owed under the Agreement. *See* Ex. B at 1.

80.    Indeed, based on Plaintiff's payment records, it appears the $10 "MODEM FEE" was a recurring monthly fee, though Plaintiff's Agreement did not explain so.

81.    As to 12 C.F.R. pt. 1013.4(d), Plaintiff's Agreement similarly fails to adequately explain what "other charges" will be applied, and when, as explained above.

82.    As to 12 C.F.R. pt. 1013.4(e), nowhere in the Agreement does Defendant disclose "the amount [Plaintiff] will have paid by the end of the lease," or something similar.

83.    That is, Defendant never tallies the total amount of money owed under the Agreement—to include initial charges, monthly charges, and other one-time fees required of Plaintiff. *See generally* Ex. B.

84.    As to 12 C.F.R. pt. 1013.4(i), Defendant does not explain in the Agreement whether Plaintiff has the option to purchase her ignition interlock device, and if at the conclusion of the lease, at what price. *See generally* Ex. B.

85.    As to 12 C.F.R. pt. 1013.4(j), Defendant also fails to include in the Agreement a statement referring Plaintiff to the remainder of the lease document for additional information on early termination, purchase options and maintenance

17

responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable. *See generally* Ex. B.

86.     To be sure, such a statement is entirely missing from Plaintiff's Agreement, likely because Defendant made little-to-no effort to segregate these necessary disclosures to begin with, as required by law.

87.     Further, to the extent any of the above-listed disclosures may be found scattered among the two pages of the Agreement, Defendant still failed to meet its burden under the CLA and Regulation M because any such disclosures are *not* properly segregated from other information in the lease, and *not* provided in a manner substantially similar to the applicable model form (attached as Exhibit A for reference).

88.     In short, Defendant's Agreement with Plaintiff is precisely what the CLA and Regulation M were enacted to avoid—a confusing onslaught of lease terms that utterly fails to "focus[] the consumer's attention on key information," as the Board intended.

89.     And Defendant's omissions are significant: at the time Plaintiff signed the Agreement, she was confused and unsure as to many of its terms, including (i) the total amount of money she owed under the lease; (ii) the exact amount of each periodic payment required by the lease; (iii) whether and to what extent other charges may be assessed beyond the monthly payment amounts; and (iv) whether she had the option to purchase the leased property at the conclusion of the lease (and if so, at what price).

90.     Confusion of this magnitude is tantamount to deception on the part of Defendant; at signing, Plaintiff remained oblivious as to the true costs of the lease. *See*

18

*McQuinn v. Bank of Am., N.A.*, 656 F. App'x 848, 849 (9th Cir. 2016); *Clement*, 145 F. Supp. 2d at 210.

91.    By virtue of its violations, Defendant is liable to Plaintiff under 15 U.S.C. § 1667d(a), 15 U.S.C. § 1640(a)(1), and 15 U.S.C. § 1640(a)(2)(A)(i) for all actual damages incurred and for statutory damages in the amount of 25% of the total amount of monthly payments due under the lease agreement.

92.    The harm suffered by Plaintiff is particularized in that the violative lease agreement was presented to her personally, regarded her personal obligations in connection with the lease of ignition interlock equipment, and failed to give her statutorily-mandated disclosures to which she was entitled.

93.    Likewise, the CLA's disclosure provisions

> serve[] to protect a consumer's concrete interest in "avoid[ing] the uninformed use of credit," a core object of the TILA. These procedures afford such protection by requiring a creditor to notify a consumer, at the time he opens a credit account, of how the consumer's own actions can affect his rights with respect to credit transactions. A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him. For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest in the informed use of credit.

*Strubel v. Comenity Bank*, 842 F.3d 181, 190-91 (2d Cir. 2016) (emphasis in original).

94.    No matter, that risk of real harm materialized here, as Plaintiff was unaware of the true costs associated with her lease of the ignition interlock device as a result of Defendant's inadequate disclosures.

95.     Had Plaintiff known of the true costs involved, she would have pursued other alternatives for the ignition interlock device she desired.

**WHEREFORE**, Plaintiff respectfully requests relief and judgment as follows:

A.     Determining that this action is a proper class action and designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Adjudging that Defendant violated 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4 for its failure to provide Plaintiff or members of the proposed class requisite segregated disclosures concerning their leases of Defendant's ignition interlock equipment;

C.     Awarding Plaintiff and members of the proposed class actual damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(1), and/or statutory damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(2)(B);

D.     Awarding Plaintiff and members of the proposed class their reasonable costs and attorneys' fees incurred in this action, including expert fees, pursuant to 15 U.S.C. § 1640(a)(3) and Rule 23 of the Federal Rules of Civil Procedure;

E.     Awarding Plaintiff and members of the proposed class any pre-judgment and post-judgment interest as may be allowed under the law; and

F.     Awarding other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Plaintiff is entitled to and hereby demands a trial by jury.

Respectfully submitted this 19th day of May, 2020.

By: *s/ Jesse S. Johnson*
Jesse S. Johnson*

* to seek admission *pro hac vice*